OPINION
Jeffrey Midkiff is appealing the judgment of the Montgomery County Juvenile Court adjudging him to be a delinquent child upon a finding that he was responsible for one count of rape.
Jeffrey Midkiff, a sixteen year old, along with his brother, a six year old, was residing with his Aunt and cousin, an eight year old, in Trotwood, Ohio.[1] Aunt was the legal custodian of Mr. Midkiff and Brother in addition to her own son.
On January 14, 2001, Aunt went upstairs to check on Brother and Cousin who were in Cousin's room with the door shut. When she opened the door, Aunt found Brother sitting on the edge of the bed with his pants down and Cousin was kneeling in front of him with his pants down also. The boys were told to stop this behavior and come downstairs. Aunt then asked Mr. Midkiff, "if he had done anything to either of the two children." (Tr. 69). Mr. Midkiff responded, "yes, [I] had done what they said but [I] was joking." (Tr. 69). When informed by his Aunt that the boys had told her that Mr. Midkiff had told them to do it or showed them how to do it, Mr. Midkiff then admitted that, "he sucked [Cousin's] stuff." (Tr. 70). Aunt called the police.
An officer reported to the house and found Mr. Midkiff hiding in a closet with a butter knife. The officer detained Mr. Midkiff without incident until Officer Ward came and transported him downtown to be interviewed while the original officer took Aunt and the boys to Children's Medical Center Emergency Room.
Doctor Lynn Peters, a pediatrician at the hospital, examined both boys. Dr. Peters then asked Cousin what happened in order to direct her physical examination. Cousin told Dr. Peters that "Randy had done something bad * * * Randy had done something that he wasn't supposed to do." (Tr. 51). Additionally, it was revealed at the hearing that both boys refer to Mr. Midkiff as "Randy" because he has the same first name as his father. Cousin was not injured and no physical evidence resulted from his examination.
When Mr. Midkiff arrived downtown, Officer Ward and Mr. Midkiff met Detective Steve Derringer in an interview room. Det. Derringer read a pre-interview form with Mr. Midkiff, going through each paragraph on the form and explaining why Mr. Midkiff was there. After each paragraph was read, Det. Derringer asked Mr. Midkiff if he understood and he responded that he did and then initialed the paragraph. Mr. Midkiff was then asked if wanted an attorney and he responded that he did not. Additionally, Mr. Midkiff did not invoke his right to remain silent, instead choosing to answer Det. Derringer's questions. Mr. Midkiff signed the waiver portion of the pre-interview form, signaling his willingness to speak with Det. Derringer.
Det. Derringer then asked Mr. Midkiff what happened. Mr. Midkiff stated that "they were joking around in the bedroom at first and it did not become a joke once [Cousin] laid down and took off his pants." (Tr. 12). Mr. Midkiff stated that he then laid down next to him and began "licking [Cousin] * * * in his groin area." (Tr. 12-13, 82-83). Mr. Midkiff went on to explain that it lasted only a minute because it did not feel right and so he stopped. During this thirty minute interview, Mr. Midkiff appeared depressed and admitted that he had attempted suicide on two occasions.
On January 14, 2001, a complaint was filed in Montgomery County Juvenile Court alleging Mr. Midkiff to be a delinquent for committing one count of rape in violation of R.C. 2907.02(A)(1)(b) if he were an adult. The complaint was later amended to add a charge of gross sexual imposition. On January 14, 2001, the trial court entertained and overruled Mr. Midkiff's motion to suppress his admission and then held a trial on the charges against Mr. Midkiff. On February 9, 2001, the juvenile court found Mr. Midkiff responsible for one count of rape and dismissed the gross sexual imposition count. On April 18, 2001, Mr. Midkiff was committed to the custody of the Department of Youth Services for a minimum of twelve months and not to exceed his attainment of twenty-one years of age.
Mr. Midkiff filed his objections to the magistrate's decision on April 24, 2001. The juvenile court overruled his objections on July 10, 2001. Mr. Midkiff then filed this timely appeal.
Mr. Midkiff raises the following assignments of error:
 1. THE TRIAL COURT ERRED AS A MATTER OF LAW BY OVERRULING THE JUVENILE'S MOTION TO SUPPRESS CLAIMING THAT THE STATEMENTS OF SAID JUVENILE WERE IMPROPERLY OBTAINED DURING A CUSTODIAL INTERROGATION BECAUSE THE CHILD WAS UNFAMILIAR WITH THE JUVENILE COURT SYSTEM, THE POLICE, AND AS WELL AS NO FAMILY MEMBER WAS AVAILABLE FOR THE JUVENILE TO CONSULT WITH, AND THUS THE JUVENILE COULD NOT KNOWINGLY AND VOLUNTARILY WAIVE HIS SO CALLED MIRANDA RIGHTS.
 2. THE TRIAL COURT ERRED BY IMPROPERLY ALLOWING THE TESTIMONY FROM A MEDICAL DOCTOR CONCERNING STATEMENTS OF AN ALLEGED VICTIM WHICH IS HEARSAY AND DOES NOT FALL UNDER ANY HEARSAY EXCEPTIONS AND WOULD BE PROHIBITED WHEN THE STATE DID NOT COMPLY WITH EVIDENCE RULE 807.
 3. THE TRIAL COURT ERRED BY FINDING THAT THE JUVENILE WAS RESPONSIBLE FOR THE DELINQUENT CHARGE BEYOND A REASONABLE DOUBT WHEN THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED CLEARLY DOES NOT REACH THAT BURDEN AND WHICH IS THE PROPER BURDEN IN AN ADJUDICATORY HEARING IN A JUVENILE DELINQUENCY MATTER.
Appellant's first assignment of error:
 Mr. Midkiff argues that his Miranda rights were violated when he made statements to the police regarding the incident. We disagree.
When reviewing a trial court's judgment on a motion to suppress, an appellate court should independently determine without deference to the trial court's opinion whether the facts meet the appropriate legal standard. State v. Curry (1994), 95 Ohio App.3d 93, 96; State v. Claytor (1993), 85 Ohio App.3d 623, 627.
In the case of Miranda v. Arizona, the U.S. Supreme Court held that statements stemming from custodial interrogations are admissible only if its shown that the police gave the suspect certain prescribed warnings before commencing the custodial interrogation, and if the warnings were not given, the statements must be suppressed. (1966), 384 U.S. 436, 444. The Ohio Supreme Court has stated, "[a] suspect's decision to waive his privilege against self-incrimination and make an admission is voluntary absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." State v. Otte (1996), 74 Ohio St.3d 555, 562, certiorari denied (1996), 519 U.S. 836, citing Colorado v. Connelly (1986),479 U.S. 157.
When the suspect is a juvenile and the court is seeking to determine if the juvenile's confession was involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality and prior criminal experience of the accused; the length, intensity, and frequency of the interrogation; and the existence of physical deprivation or inducement. In re Watson (1989), 47 Ohio St.3d 86, certiorari denied (1990), 495 U.S. 937. If the juvenile has already been informed of his rights to an attorney and right to remain silent, the juvenile's parents or guardian do not have to be informed of these rights prior to any custodial interrogation in order for the juvenile's statements to be admissible at the juvenile's trial. In re Watson, supra, at 89. The State has the burden of proving, by a preponderance of the evidence, the voluntariness of an admission. State v. Gumm (1995), 73 Ohio St.3d 413,429, certiorari denied (1996), 516 U.S. 1177.
On July 15, 1998 when Det. Derringer questioned Mr. Midkiff, Midkiff was sixteen years old, able to read and write, and had completed nine years of schooling. (Tr. 15, 29). Det. Derringer testified that there was no physical deprivation or mistreatment of Mr. Midkiff and there was also no existence of a threat or inducement that would have compelled Mr. Midkiff to admit responsibility. (Tr. 12). Det. Derringer carefully reviewed each right on the pre-interview form with Mr. Midkiff and Mr. Midkiff verbally acknowledged that he understood each right and initialed each paragraph. (Tr. 10). Only once the pre-interview form had been reviewed and Mr. Midkiff signaled his understanding of the form did Mr. Midkiff waive his Miranda rights. (Tr. 9-10).
In addition to the form, Det. Derringer asked Mr. Midkiff if he wanted a lawyer and Mr. Midkiff responded that he did not and he did not invoke his right to remain silent. (Tr. 11-12, 17). Mr. Midkiff agreed to answer Det. Derringer's question and throughout the interview never refused to answer any questions. (Tr. 11-13). The entire interview only lasted thirty minutes with Mr. Midkiff telling Det. Derringer what happened after he signed the waiver. (Tr. 12-13). Considering the brevity of the interview, Mr. Midkiff's age, the signed pre-interview form, and Det. Derringer's testimony that he explained the Miranda rights and Mr. Midkiff agreed to waive them gives a strong presumption that the waiver was voluntary.
However, Mr. Midkiff argues that his waiver and admission were involuntary because he was not given the opportunity to speak with his father or his guardian. It appears from the transcript that on the motion to suppress, a second officer testified; however this testimony was not recorded on the transcript. Mr. Midkiff submits that this unrecorded testimony included a statement which indicated that Mr. Midkiff's father arrived at the detainment but was not permitted to contact Mr. Midkiff. However, there is no evidence in the record that Mr. Midkiff's father attempted to speak with him and was not permitted to do so. Procedures are listed in App.R. 9(C) and (D) for reconstructing the record when a portion or the entire transcript is unavailable. App.R. 9(C) permits an appellant to "prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection." This statement must be served on the opposing party at least twenty days prior to the date for transmission of the record. App. R. 9(C); In re Jovan Hancock (Feb. 2, 2001), Montgomery App. No. 18238, unreported. In the instant case, Mr. Midkiff has made no attempt to reconstruct the record pursuant to App.R. 9(C). Therefore, this court cannot consider the assertion by Mr. Midkiff in his brief that his father was not permitted to meet or speak with Mr. Midkiff while he was detained. Further there is no evidence that Mr. Midkiff requested to speak with his father or anyone else.
Additionally, Mr. Midkiff appears to argue that the police were aware of his emotional instability and as such his waiver and admission were involuntary. In support of this argument, Mr. Midkiff points to the fact that the interviewing officers were aware that he had previously considered committing suicide, including when the police crews came to detain him. When the police came to detain him, Mr. Midkiff was found in a closet with a butter knife. Evidence of police overreaching or coercion is necessary for a finding of involuntariness. State v. Hill (1992),64 Ohio St.3d 313, 318 certiorari denied (1993), 507 U.S. 1007. We find no evidence that Mr. Midkiff was acting out of fright or despair or coercive conduct or threats on the part of the police. After reviewing the record, we find that the totality of the circumstances demonstrates that Mr. Midkiff was able to comprehend and answer questions coherently. We agree with the trial court that Mr. Midkiff voluntarily waived his rights and gave his admission. Mr. Midkiff's first assignment of error is without merit and overruled.
Appellant's second assignment of error:
 Mr. Midkiff argues that the trial court erred in admitting testimony from a medical doctor concerning hearsay statements of an alleged victim. We disagree.
Evid. R. 807 is a hearsay exception for situations in which a child under twelve years of age has allegedly been sexually or physically abused. Under Evid.R. 807, a child's out of court statements may be admitted through the testimony of others where the following four factors apply: (1) the totality of the circumstances surrounding the child's statements provides particularized guarantees of trustworthiness, (2) the child's testimony is not reasonably obtainable, (3) there is independent proof of the alleged act, and (4) proper notice is given that such testimony will be used. Evid. R. 807(A)(1)-(4).
Additionally, Evid. R. 803(4) permits admission through testimony of hearsay statements which are made for purposes of medical diagnosis or treatment. The fact that the initial motivation to seek diagnosis and treatment from a medical professional was not the child's but that the child was directed there does not automatically exclude the child's statement. State v. Denver (1992), 64 Ohio St.3d 401 certiorari denied (1993), 507 U.S. 919. Therefore, under Denver, supra, a trial court has broad discretion in determining whether a child's out of court statement is admissible as a hearsay exception. Id. at 410. In making this determination, a trial court must consider the circumstances surrounding the child's out of court statement to determine if it was made to a medical professional for the purposes of diagnosis or treatment. Id. The court:
 may consider whether the child's statement was in response to a suggestive or leading question * * * and any other factor which would affect the reliability of the statements * * *. If no such factors exist, then the evidence should be admitted. The credibility of the statements would then be for the [trier of fact] to evaluate in its role as fact finder.
Id. at 410-411.
Additionally, in State v. Brooks, a child's statements to a social worker which were relayed to an emergency room doctor for treatment were admissible, particularly in light of the fact that the child testified and the defendant had an opportunity to cross examine her about the statements. (Oct. 26, 2001), Montgomery App. No. 18502, unreported.
Mr. Midkiff argues that the trial court erred in permitting Dr. Peters to testify as to what Cousin stated to her during the examination at the emergency room because the situation did not fit the factors necessary for admission of hearsay under the exception in Evid.R. 807. Although the State agrees that the hearsay testimony could not be admitted under Evid. R. 807, the State argues that the trial court appropriately admitted the testimony under Evid. R. 803(4). Dr. Peters testified that in the beginning of Cousin's examination she asked him what had happened. Dr. Peters testified that this was a routine question she asks to direct her examination to determine if the child has suffered any injuries. (Tr. 48, 53). Dr. Peters explained that she asks this question so she knows where to look and what to do. (Tr. 49). Dr. Peters testified that she was patient with Cousin and assured that he knew why he was there. (Tr. 48). Cousin testified that he was at the hospital to get checked out in case he was hurt. (Tr. 35). We cannot find that the trial court abused its discretion when it found that Cousin's statements were in response to questions asked for the purposes of medical diagnosis and treatment and therefore where admissible under the hearsay exception provided in Evid. R. 803(4).Additionally, Cousin testified at trial and Mr. Midkiff had an opportunity to cross examine him regarding the statements to the emergency room physician. (Tr. 36). Mr. Midkiff's second assignment of error is without merit and overruled.
Appellant's third assignment of error:
 Mr. Midkiff argues that the trial court's finding of him responsible for rape and declaring him to be delinquent was against the manifest weight of the evidence. We disagree.
R.C. 2907.02(A)(1)(b) states:
 [N]o person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when * * * the other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
Sexual conduct includes fellatio. R.C. 2907.01(A). The appropriate test to determine whether a trial court's determination is supported by the manifest weight of the evidence is as follows:
 [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflict in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Martin (1983), 20 Ohio App.3d 172, 175. When dealing with the credibility of a witness, an appellate court will not substitute its judgment for that of the trier of fact unless it is apparent that the fact finder lost its way. State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03, unreported.
Mr. Midkiff argues that because both Cousin and Brother were unable to articulate details about what happened between them, Aunt lacked credibility, and the doctor could find no signs of trauma on the boys, the trial court's decision was against the manifest weight of the evidence. Cousin was able to testify that "[Mr. Midkiff] told him something bad not to do." (Tr. 34). Brother testified that "[Mr. Midkiff is] doing nasty stuff to [Cousin]." (Tr. 42-43). Although Brother and Cousin could not relate the details of the offense, the trier of fact is in the best position to weigh the credibility of the boys' testimony. Also, the State presented Cousin's statement to Dr. Peters that "[Mr. Midkiff] had done something bad * * * [Mr. Midkiff had done something he wasn't supposed to do." (Tr. 51). Additionally, Aunt testified to the events of the day Mr. Midkiff was detained, corroborating the testimony of Brother and Cousin. Aunt testified that she found Brother on the bed with his pants down and Cousin on his knees on the floor in front of him with his pants down. One can infer from this behavior that the boys were acting out what Mr. Midkiff had shown them.
Moreover, the evidence established that Mr. Midkiff admitted to the offense twice. When Aunt asked Mr. Midkiff if he had done anything to the boys to which he responded, "yes, [I] did what they said but [I] was joking," and after further questioning he stated that he "sucked [Cousin's] stuff." (Tr. 69-70). Additionally, when giving a statement to Det. Derringer, Mr. Midkiff stated that he and Cousin:
 were joking around in the bedroom at first and it did not become a joke once [Cousin] laid down and took off his pants. That's when Mr. Midkiff laid down next to him * * * Then [Mr. Midkiff] started giving him oral sex. He said it lasted for approximately one minute, didn't feel right, so he quit.
(Tr. 12-13). When asked what he meant by oral sex, Mr. Midkiff responded that he "began licking Cousin * * * down in his groin area." (Tr. 82-83). Mr. Midkiff argues that his statements to his Aunt were sarcastic and the statements to the police were explaining why he thought he was there. However, these statements corroborate the testimony of Aunt, Brother, and Cousin and the remaining circumstantial evidence. We find that this evidence weighs in favor of the trial court's determination and we cannot say that adjudging Mr. Midkiff a delinquent based on finding him responsible for a rape created a manifest miscarriage of justice. Therefore, the judgment of the trial court is not against the manifest weight of the evidence and Mr. Midkiff's third assignment of error is without merit and overruled.
The judgment of the trial court is affirmed.
WOLFF, P.J. and BROGAN, J., concur.
[1] In order to preserve the anonymity of the victim and the victim's family, the parties will hereinafter be referred to as "Brother", "Aunt" and "Cousin".